UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
DILLON A. KNOPICK and STEFANI L.
KNOPICK,

                         Plaintiffs,              3:09-CV-232

              v.

METROPOLITAN LIFE INSURANCE
COMPANY and ADSPACE NETWORKS, INC.,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

THOMAS, COLLISON, MEAGHER         DANIEL L. SEIDEN, ESQ.
& SEIDEN
Attorneys for Plaintiffs
P.O. Box 329
1201 Monroe Street
Endicott, New York 13760


HODGSON RUSS LLP                  CHRISTIAN J. SOLLER, ESQ.
Attorneys for Defendants
677 Broadway, Suite 301
Albany, New York 12207


DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I.  INTRODUCTION

        Plaintiffs Dillon A. Knopick and Stefani L. Knopick (collectively "plaintiffs" or

"Knopicks") brought this suit against Metropolitan Life Insurance Company ("MetLife") and

Adspace Networks, Inc. ("Adspace") (collectively "defendants") alleging MetLife breached its

contract with plaintiffs' father Roger Knopick ("decedent") by refusing to pay plaintiffs a supplemental life insurance benefit after his death.  The Knopicks also allege Adspace, the decedent's former employer, was negligent in failing to timely delivery the decedent's enrollment documents to MetLife.  Plaintiffs contend this delay contributed to the denial of supplemental benefits.

Plaintiffs moved for judgment on the record.  Defendants opposed and moved for summary judgment dismissing the complaint.  Plaintiffs opposed.  Oral argument was heard in Utica, New York on August 13, 2010.  Decision on both motions was reserved.

## II.  **BACKGROUND**

The following facts are undisputed unless otherwise noted.[1]  Prior to his death decedent resided in California and was employed by defendant Adspace.  Adspace offered its employees supplemental life insurance coverage[2] under its Supplemental Term Life and Accidental Death and Dismemberment Plan (the "Plan") which was funded by a group policy issued to Adspace by MetLife.  To facilitate its insurance offerings, Adspace utilized the brokerage services of the Hauser Group.

The Plan provides "[i]f You are in an eligible class on April 01, 2008, You will be eligible for insurance on that date."  MET 0097.  As an active full-time non-officer employee of Adspace, decedent was within the class of eligible employees, and thus had the option to enroll on April 1, 2008.  The enrollment provision provides:

---

[1] The administrative record has been submitted by both parties and includes a copy of the life insurance policy.  The record was filed as Pls. Mem. of Law ("MOL"), Ex. A, Dkt. Nos. 23-3 to 23-6 and Defs.' Statement of Material Facts, Ex. F, Dkt. Nos. 24-8, 24-9.  Defs.' version is Bates-stamped with the precursor "MET" and will be cited hereafter for ease of reference as "MET - - - -".

[2] Supplemental life insurance is contributory insurance requiring the participant to pay all or part of the premium.

> If You are eligible for insurance, You may enroll for insurance by completing the required form.  In addition, You must give evidence of Your insurability satisfactory to Us[3] at Your expense if You are required to do so under the section entitled EVIDENCE OF INSURABILITY.

Id.

On April 1, 2008, decedent completed an application for life insurance benefits and elected coverage in the amount of $420,000.  He named the plaintiffs, both adult children of the decedent, as primary beneficiaries for thirty-five percent (35%) each and a third party for thirty percent (30%) of the benefits.  By enrolling in the Plan, the decedent authorized semi-monthly deductions from his paycheck in the amount of $28.75.

### A.  Evidence of Insurability

The parties dispute the meaning of "Evidence of Insurability."  Under the Plan, employees could elect coverage in multiples of $10,000 up to a maximum of $500,000.  Of that, the first $100,000 was a Non-Medical Issue ("NMI") amount, which was a guaranteed benefit and required no further eligibility or approval.  Any coverage in excess of the NMI amount required Evidence of Insurability.  The section titled Evidence of Insurability provides:

> We require evidence of insurability satisfactory to Us as follows:
>
> 1.  In order to become covered for an amount of Supplemental Life Insurance greater than the Non-Medical Issue Amount as shown in the SCHEDULE OF BENEFITS.
>
> If You do not give Us evidence of Your insurability, or if such evidence of insurability is not accepted by Us as satisfactory, the amount of Your Supplemental Life Insurance will be limited to the Non-Medical Issue Amount.

---

[3] The Plan defines "Us" and "We" as MetLife.

MET 00109.  The terms "underwriting" nor "physical examination" appear in this section nor within the definition section of the policy.[4]

The decedent submitted the enrollment materials on April 1, 2008, while he was actively at work, to Adspace's Human Resources Director Lana Krasnyansky ("HR Director"). Based on his decision to elect an additional $320,000 of coverage in excess of $100,000 NMI amount, Evidence of Insurability was required.  To satisfy this requirement, decedent completed the Statement of Health ("SOH") included in the enrollment packet.  The SOH requested a brief medical history and authorized MetLife to conduct further inquiries as to the applicant's health history if deemed necessary.[5]

### B. Effective Date of Coverage

The parties dispute the effective date of coverage for the policy.  The Knopicks contend the effective date for all benefits was April 1, 2008.  MetLife argues NMI coverage was effective April 1, 2008, but coverage in excess of that was not in effect until they stated so in writing.  Under the Plan section titled Eligibility Provisions: Insurance for You, the effective date is defined:

**Rules for Contributory Insurance**

If You request Contributory Insurance **within 31 days of** the date You become eligible for such insurance, such insurance will take effect as follows:

---

[4] The term "physical exams" is defined elsewhere in the Plan as meaning "[i]f a claim is submitted for insurance benefits, We have the right to ask the insured to be examined by a Physician(s) of Our choice as often as is reasonably necessary to process the claim.  We will pay the cost of such exam." MET 00135.

[5] While the parties disagree whether this form indicates that medical underwriting was required, the words "Small Market Medical Underwriting" along with an address appear at the top of the SOH.

- If You are **not required** to give evidence of Your insurability, such insurance will take effect on the later of:
- the date You become eligible for such insurance; and
- the date You enroll
  provided you are Actively at Work on that date.

- if You are **required** to give evidence of Your insurability and We determine that You are insurable, such insurance will take effect on the date We state in Writing, provided You are Actively at Work on that date.

MET 0098.

## C.  MetLife's Review of Plaintiffs' Claim for Benefits

Decedent died on April 8, 2008, just one week after he completed the enrollment documents described above.  As previously mentioned, decedent was actively at work on both April 1, 2008, the date he completed the enrollment documents, and on April 8, 2008, on the day he died.  Plaintiffs each completed a Claimant's Statement dated May 10, 2008.  Adspace's HR Director thereafter filed a group life insurance claim on behalf of the beneficiaries.  MET 0011-0014.  The claim was for $50,000 of basic life insurance and $420,000 of supplemental life insurance.  The HR Director then mailed the claim materials[6] to MetLife on June 4, 2008.  MET 007-0031.

MetLife's records[7] show that an initial claim for benefits was entered into the MetLife system on June 5, 2008.  MET 006.  On June 17, 2008, MetLife employee Robert

---

[6] According to MetLife, the employer must submit: the completed Employer's Statement, the Claimant's Statement(s), a certified copy of the death certificate, and all other pertinent claim information (such as enrollment forms and beneficiary designations).  MET 0030.

[7] The administrative record includes MetLife's "Claim Comments List."  MET 001-006.  This appears to be a list of all computer entries and comments made by MetLife employees related to the claim for benefits.

Gondek e-mailed fellow employee Lauren Leverenz[8] inquiring about the beneficiaries' claim for $420,000.  MET 0047.  Mr. Gondek's notes indicate that MetLife's database[9] showed optional coverage of $100,000 but that Adspace claimed $420,000.  Id.  He then notified Adspace's HR Director about the discrepancy between the amount claimed and the coverage reflected in MetLife's database.  MET 005.  They agreed MetLife would pay the $50,000 basic policy and the $100,000 optional.  Id.  On or about June 18, 2008, MetLife authorized payment of the NMI amount of $100,000 and the undisputed $50,000 policy.  MET 004.  The plaintiffs were each issued their respective shares of the benefits.

On June 18, 2008, Ms. Leverenz notified Mr. Gondek that she was looking into the issue and it appeared Adspace submitted a SOH to MetLife for the full $420,000 but that MetLife did not send the SOH to underwriting for review.  MET 0048.  A June 20, 2008, entry on MetLife's system shows Ms. Leverenz advised Mr. Gondek that the benefit requested was $420,000 but because the SOH was not received until almost a month after the decedent died, at that time, only $100,000 of the optional coverage and the undisputed $50,000 policy should be paid out.  MET 003.

---

[8] Ms. Leverenz was the contact at MetLife for Adspace's group policy.

[9] A computer generated "Group Facts screen" showed this information.

It appears from the record that at some point during Fall 2008[10] plaintiffs' attorney, Daniel L. Seiden, made a demand on MetLife for his clients' portion of the supplemental coverage--$224,000, or seventy percent (70%) of the $320,000 MetLife denied.  MET 0049-0056.  On December 6, 2008, the matter was referred to a MetLife employee for review.[11] MET 0059-0060.  The referral form stated:

> CLAIM PAID IN FULL FOR APPROVED AMOUNTS OF BLI/OLI ON 6/19/08. THE OLI WAS SUBMITTED FOR $420,000 HOWEVER A SOH WAS REQUIRED AND NOT RECD UNTIL AFTER THE EE'S DEATH SO ONLY THE GUARANTEED issue amount OF $100,000 WAS ISSUED. I DO NOT SEE WHERE A DENIAL FOR THE DIFFERENCE WAS EVER SENT, WE ARE NOW RECEIVING A DEMAND FROM AN ATTY FOR THE BENE'S TO ISSUE THE DIFFERENCE.

MET 0059.  The "Suggested Handling" portion of the referral stated "AGREE TO PREPARE DENIALS BASED ON SOH REQUIRED AND NOT PROVIDED PRIOR TO DEATH?"  MET 0060.  The "Course of Action" provided by the referring employee was: "Agree to draft denial letter. I have the certificate at my desk and can advise as to some of the information we should put in our letter."  Id.  The computer entry for the December 6, 2008, referral states "referring to [A]ndrea now to confirm denial should be prepared."  MET 002.

The Claim Comments List indicates that on January 8, 2009, Mr. Seiden contacted MetLife to inquire about the status of the claim.  Id.  A January 9, 2009, entry and e-mail

---

[10] An October 1, 2008, letter from Mr. Seiden to Daniel J. Connaughton, Regional Director of MetLife Group, informed Mr. Connaughton of the facts relating to the claim and made a demand for payment.  Mr. Seiden then sent a follow-up letter to Mr. Connaughton on November 12, 2008, after receiving no response to the October 1, 2008, letter.  On November 18, 2008, Mr. Seiden was informed by MetLife employee Andrea Espinosa that his demand was forwarded from Mr. Connaughton to the appropriate office at MetLife.  Ms. Espinosa requested that Mr. Seiden forward the original materials to the claims department at MetLife.  By letter dated November 19, 2008, Mr. Seiden forwarded his previous correspondence to MetLife's claims department and indicated that if no response was received, suit would be filed on or around December 1, 2008.  MET 0049-0056.

[11] Metlife employee Heidi Kloczkowski referred the matter to Ms. Espinosa.

shows that the MetLife employee[12] handling the claim was instructed to draft a denial letter.
MET 002, 0061.  On January 16, 2009, that employee produced a denial letter for review and
was instructed on January 21, 2009, to mail the letter because an SOH was not received
prior to the decedent's death.  MET 001, 0068.

### D.  MetLife's Denial of Supplemental Benefits in Excess of the NMI Amount

By letters dated January 24, 2009, plaintiffs received correspondence from MetLife
informing them that their claim for $320,000 of supplemental coverage in excess of the
$100,000 NMI amount was denied.  MET 0064-0067.  The letters provided:

> According to the information contained in our file Mr. Knopick had elected
> to increase his coverage to $420,000.00. However, and as stated, the
> Adspace Networks, Inc benefits plan requires Statement of Health
> approval for any amount exceeding $100,000.00. Neither the employer
> nor the MetLife Statement of Health Unit has any record of such an
> approval.
>
> Due to the lack of medical evidence of insurability as required under the
> Plan, we must deny $320,000.00 of the amount claimed.

MET 0065, 0067.

On January 28, 2009, plaintiffs filed a Summons with Notice in Broome County
Supreme Court.  On February 26, 2009, defendants removed the case to federal court
because plaintiffs' claims are covered by the Employee Retirement Income Security Act
("ERISA").  See 29 U.S.C. §§ 1001-1461 (2006).

Plaintiffs thereafter served discovery demands upon defendants including a notice
of deposition.  Defendants moved to strike those demands as well as plaintiffs' jury demand.
By Order dated March 12, 2010, Magistrate Judge David E. Peebles struck plaintiffs' jury

---

[12] Ms. Espinosa instructed Ms. Kloczkowski to prepare the denial.

demand and compelled defendants to comply with plaintiffs' discovery demands.  See Dkt. No. 18.

In accordance with that decision, Ms. Krasnyansky testified at a nonparty deposition in Cleveland, Ohio on May 27, 2010, in her capacity as Adspace's former HR Director.  Through discovery plaintiffs were also provided with documentation relating to resolution of the Knopicks' claim including a May 7, 2008, letter and Certificate of Insurance from MetLife to Adspace's HR Director.

The May 7, 2008, letter stated: "We are pleased to advise you that the installation of your new coverage(s) with us is now complete!"  Pls.' MOL, Ex. C, Dkt. No. 23-9 ("May 7 letter").  Enclosed with the letter was the policy, "which include[d] your [Adspace's] Application for Group Insurance, and the applicable Certificate."  Id.  The letter indicated that "[a]dditional Certificates for you [Adspace] to distribute to all of your insured employees will be shipped separately within the next few days."  Id.

The Certificate of Insurance accompanying the May 7 letter provided that MetLife "will pay the benefits specified in the Exhibits of this policy subject to the terms and provisions of this policy [and] [t]he Schedule of Exhibits lists each Exhibit to this policy, to whom it applies and its effective date."  Pls.' MOL, Ex.  D, Dkt. No. 23-9 ("Certificate of Insurance").  The Certificate of Insurance provided that "[t]his policy will take effect on April 01, 2008."  Id.  The Certificate of Insurance itself is dated May 7, 2008.  Id.  The policy anniversaries are listed as April 1, 2009, and each subsequent April 1.  Id.  The Certificate of Insurance is signed by Gwenn L. Carr, MetLife's Vice President and Secretary; C.  Robert Henrikson, Chairman of the Board, President and Chief Executive; and Thomas A.  Flavin, a

licensed MetLife agent or resident agent.  Id.  It states that it is "[s]igned as of this policy's effective date at MetLife's home office in New York, New York."  Id.

The May 7 letter nor Certificate of Insurance distinguished in any way between the guaranteed coverage in the NMI amount of $100,000 and coverage in excess of that amount. Neither the letter nor Certificate mentioned SOH approval nor indicated that MetLife was in the process of underwriting.  Aside from indicating that MetLife would be shipping, separately, additional certificates for all of Adspace's insured employees, the letter nor Certificate made mention of any subsequent approval required or notifications that would be provided.

Plaintiffs also received a copy of a July 8, 2008, e-mail from an Adspace employee[13] to Ms. Leverenz.  Pls.' MOL, Ex. A-6, Dkt. No. 23-9.  The e-mail informed Ms. Leverenz that Roger Knopick's insurance paperwork was received at Adspace's New York office on April 3, 2008, from Adspace's California office.[14]  The enrollment documents were forwarded from Adspace's New York office to the Hauser Group[15] who then delivered them to MetLife.

---

[13] The e-mail was sent by Elizabeth Brody, Assistant to Adspace's HR Director.

[14] Josie Kellogg was the Office Administrator in Adspace's California office where the decedent worked.  She collected the enrollment paperwork from decedent and forwarded it to Adspace's main office in New York.

[15] The paperwork was sent from Adspace's New York office to Karen Clenney at the Hauser Group.

## III.  DISCUSSION

### A.  Legal Standards

#### 1.  Plaintiffs' Motion for Judgment on the Record

Preliminarily, it should be noted that plaintiffs moved for "judgment on the record"--a motion that is not specifically authorized by the Federal Rules of Civil Procedure.  See Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2004).  The Knopicks proposed that their motion be considered as a bench trial on the papers.[16]

The Second Circuit has noted that courts have either "explicitly or implicitly treated such motions . . . as motions for summary judgment under Rule 56."  Id. (citation omitted).  While District Courts in this Circuit have split on how to treat a motion for judgment on the record, when as here, a motion for summary judgment has not yet been decided,[17] most courts have construed a motion for judgment on the record as one for summary judgment.  See Gannon v. Aetna Life Ins. Co., 05 Civ 2160, 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 27, 2007) (citing Pava v. Hartford Life & Accident Ins. Co., No. 03 Civ 2609, 2005 WL 2039192, at *6 (E.D.N.Y. Aug. 24, 2005)); see also Guglielmi v. Northwestern Mut. Life Ins.

---

[16] The Knopicks have suggested that in accordance with Muller, their motion should be treated as a bench trial on the papers.  See Muller, 341 F.3d at 124.  Plaintiffs misread Muller.  In Muller, the Second Circuit, for the purpose of determining its own standard applicable to the review of the District Court's disposition, found that a bench trial on the papers had been appropriate because the District Court had already denied a motion for summary judgment and no additional discovery had taken place.  See id.  Contrary to plaintiffs' interpretation, the court in Muller specifically noted that motions for judgment on the record are usually treated as motions for summary judgment.  See id.

[17] See Flanagan v. First Unum Life Ins., 170 Fed. Appx. 182, 184 (2d Cir. 2006) (citing Muller, 341 F.3d at 124); see also Zurndorfer v. Unum Life Ins. Co. of Am., 543 F. Supp. 2d 242, 254-55 (S.D.N.Y. 2008) (citing Slupinski v. First Unum Life Ins. Co., No. 99 Civ. 0616, 2005 WL 2385852, at *4-5 (S.D.N.Y. Sept. 27, 2005) (collecting cases and deciding motions as bench trial on the papers), rev'd on other grounds, 554 F.3d 38 (2d Cir. 2009)).  Some District Courts have construed a motion for judgment on the record as a motion for summary judgment under Rule 56, while others have taken it as a request for a bench trial on the papers under Rule 52(a).  Slupinski, 2005 WL 2385852, at *5.  The Second Circuit has indicated its approval of both approaches.  Muller, 341 F.3d at 124.

Co., No. 06-CV-3431, 2007 WL 1975480, at *3 (S.D.N.Y. July 6, 2007); <u>Chitou v. Unum</u>

<u>Provident Corp.</u>, No. 05-CV-8119, 2007 WL 1988406, at *3 (S.D.N.Y. July 6, 2007);

<u>Katzenberg v. First Fortis Life Ins. Co.</u>, No. 05-CV-1146, 2007 WL 1541468, at *14 (E.D.N.Y.

May 25, 2007); <u>Charles v. First Unum Life Ins. Co.</u>, No. 02-CV-0748E, 2004 WL 963907, at

*1 (W.D.N.Y. Mar. 26, 2004).

      As no motion for summary judgment has yet been decided in this case and there

are threshold disputes as to whether MetLife's determination is entitled to deference and

whether evidence outside the administrative record may be considered, plaintiffs' motion for

judgment on the record will be construed as a motion for summary judgment.  <u>See</u>

<u>Zurndorfer</u>, 543 F. Supp. 2d at 255.

### 2.  Summary Judgment Standard

      Summary judgment is warranted when the pleadings, depositions, answers to

interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact.

Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S. Ct. 2505,

2509-10 (1986).  A fact is considered "material" for purposes of Rule 56 if it "might affect the

outcome of the suit under the governing law."  <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248, 106 S.Ct.

at 2510.  Whether a dispute over a material fact is "genuine" depends on whether the

evidence is of a type that would permit a reasonable finder of fact to return a verdict in favor

of that party.  <u>Id</u>.

### 3.  Standard of Review under ERISA

      The parties agree this action is governed by ERISA.  ERISA does not set out the

appropriate standard of review for actions challenging benefit determinations under

§ 1132(a)(1)(B).  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 109, 109 S.Ct. 948,

953 (1989).  Rather, the Supreme Court has explained "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Id. at 115, 109 S. Ct. at 956-57.  When the plan confers upon the administrator discretionary authority to construe the terms of the plan, a District Court should examine the administrator's decision under an excess of allowable discretion standard.  See Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 108 (2d Cir. 2005) (noting that the proper standard when a plan vests the administrator with discretionary authority is "abuse of discretion").

Under such a standard, an administrator abuses its discretion only when the administrator's actions are arbitrary and capricious.  McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 132 (2d Cir. 2008).  In reviewing the administrator's decision, a District Court must consider "whether the decision was based on a consideration of the relevant factors."  Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995) (citation omitted).  A denial of a claim is arbitrary and capricious if "there has been a clear error of judgment."  Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995).

Since this is a highly deferential standard of review, a court "may overturn an administrator's decision to deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law."  Hobson v. Metro. Life Ins. Co.,  574 F.3d 75, 83-84 (2d Cir. 2009).  Substantial evidence consists of "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance."  Miller, 72 F.3d at 1072 (citation omitted).

Applying a deferential standard of review to the administrator's decision does not mean the administrator will prevail on the merits. Conkright v. Frommert, 130 S. Ct. 1640, 1651 (2010). It means only that the administrator's interpretation of the plan "will not be disturbed if reasonable." Id. (quoting Firestone, 489 U.S. at 111, 109 S. Ct. at 954). Although a reviewing District Court must apply the standard established in Firestone, the Supreme Court has refused to require rigid deference. Conkright, 109 S. Ct at 1651.

Under both the de novo and arbitrary and capricious standards, an administrator's conflict of interest may affect how a court reviews the benefits determination. In Metro. Life Ins. Co. v. Glenn, the Supreme Court held that an administrator who "both evaluates claims for benefits and pays benefits claims" is conflicted. Glenn, 554 U.S. 105, __, 128 S.Ct. 2343, 2348 (2008). Such a conflict of interest should be weighed as a factor in a District Court's analysis. Id. at 2348-50. The factor's weight depends on the circumstances. Id. at 2351. "A plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of several different considerations that judges must take into account when reviewing the lawfulness of benefit denials." Hobson, 574 F.3d at 82-83 (internal quotations omitted) (citing McCauley, 551 F.3d at 133).

The Second Circuit is clear that a District Court's review under the arbitrary and capricious standard is limited to the administrative record. Id. at 1071; see also Zervos v. Verizon N.Y., Inc., 277 F.3d 635, 646 (2d Cir. 2002); Magin v. Cellco P'ship, 661 F. Supp. 2d 206, 213 (N.D.N.Y. 2009); Fredericks v. Hartford Life Ins. Co., No. 5:05-CV-1344, 2009 WL 174952, at *9 (N.D.N.Y. Jan. 23, 2009). The administrative record must be viewed as a whole in deciding whether the administrator's decision was without reason, unsupported by substantial evidence, or erroneous as a matter of law. See, e.g., Cohen v. Metro. Life Ins.

Co., 485 F.Supp.2d 339, 354 (S.D.N.Y. 2007) ("consider[ing] MetLife's entire administrative record" and "determin[ing] as a matter of law that MetLife's invocation of the exclusion was arbitrary and capricious").

However, a court may consider additional evidence outside the administrative record upon a finding of good cause.  DeFelice v. Am. Int'l Life Assurance Co. of N.Y., 112 F.3d 61, 66-67 (2d Cir. 1997); see also Paese v. Hartford Life & Accident Ins. Co. of N.Y., 449 F.3d 435, 441 (2d Cir. 2006).  Good cause has been found where there was a demonstrated conflict of interest and the procedures employed in arriving at the claim determination were flawed.  Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 295 (2d Cir. 2004) (citing DeFelice, 112 F.3d at 66) (basing its holding not only on a demonstrated conflict of interest in the administrative reviewing body but also upon the procedural problems with the plan administrator's appeals process); see also Lee v. Aetna Life & Cas. Ins. Co., No. 05 Civ. 2960, 2007 WL 1541009, at *4 (S.D.N.Y. May 24, 2010) (noting that evidence outside the administrative record may be admissible to show that the decision-making process was arbitrary and capricious).  The Second Circuit has cautioned however that a conflicted administrator or fiduciary does not per se constitute good cause and "a conflicted administrator alone should not be translated *necessarily* into a finding of good cause." Locher, 389 F.3d at 296.

Plaintiffs also attempt to argue that "Evidence of Insurability" is ambiguous and should therefore be construed against MetLife under contract principles.  This contention fails.  While the term may not be clearly defined in the Plan, it is well settled in this Circuit

that the rule of contra proferentem[18] does not apply upon review under the arbitrary and capricious standard. See Pagan v. NYNEX Pension Plan, 52 F.3d 438, 443-44 (2d Cir. 1995). Application of the rule of contra proferentem is limited to those occasions in which an ERISA decision is reviewed de novo. Id.

### B. Analysis

### 1. Preemption of Plaintiffs' Breach of Contract and Negligence Claims

Defendants moved for summary judgment on plaintiffs' breach of contract and negligence claims on the basis that they are common law claims preempted by ERISA. See § 1144(a). Plaintiffs do not oppose defendants' motion for summary judgment on this ground and offer no argument as to why we should not dismiss these claims.

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." Id. Such state laws and regulations encompass not only statutory provisions but common law claims as well. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47-48, 107 S.Ct. 1549, 1553 (1987) (preempting breach of contract and tort claims against insurance company). The phrase "relate to" has been given its broad common-sense meaning, "such that a state law relate[s] to a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan." Id. (citing Met. Life Ins. Co. v. Mass., 471 U.S. 724, 739, 105 S.Ct. 2380, 2389 (1985) (internal quotations omitted)).

Plaintiffs' complaint on its face appears to assert only common law claims of breach of contract and negligence. The parties agree that this case is governed by ERISA

---

[18] While plaintiffs do not specifically assert this argument using the doctrine of contra proferentem, it is essentially what they argue. The rule of contra proferentem is "that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter." O'Neil v. Ret. Plan For Salaried Emps. of RKO Gen., Inc., 37 F.3d 55, 61 (2d Cir. 1994) (internal quotations omitted).

which allows a plan participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." § 1132(a)(1)(B).

Plaintiffs' claim for breach of contract stems from MetLife's failure to pay benefits under the Plan and thus relates to the Plan for purposes of preemption. However it appears plaintiffs' cause of action is really one under § 1132(a)(1)(B) and plaintiffs have misstated it as a common law breach of contract claim. Therefore the breach of contract cause of action against MetLife will not be dismissed as preempted by ERISA but will instead be construed as a claim under § 1132(a)(1)(B).

Defendants argue the negligence claim asserted against Adspace should also be dismissed as preempted by ERISA. The negligence claim is plaintiffs' only cause of action against defendant Adspace. The Knopicks allege that despite the decedent's return of his enrollment forms on April 1, 2008, to the HR Director, Adspace did not transfer the forms and information to MetLife until after Roger Knopick died. They allege that the enrollment forms and the employer's statement for life insurance benefits were not submitted to MetLife until June 3, 2008. As damages against Adspace plaintiffs seek $224,000--their seventy percent (70%) share of the $320,000 at issue.

Plaintiffs have not offered any evidence demonstrating Adspace's negligence or delay in submitting decedent's enrollment documents. To the contrary, the evidence reveals that the Office Administrator in decedent's office received his paperwork and forwarded it to Adspace's New York office on April 3, 2008, only two days after decedent submitted the documents. An e-mail from an Adspace employee to Ms. Leverenz indicates that upon

receiving decedent's enrollment materials at Adspace's New York office, they were forwarded to the Hauser Group who then delivered them to MetLife.

Nevertheless, there is no need to address the merits of plaintiffs' negligence claim against Adspace. The negligence cause of action is not independent of the Plan. It instead relates entirely to the Plan because plaintiffs allege Adspace's delay in delivering the enrollment materials resulted in MetLife's denial of benefits. For this reason, the negligence claim against Adspace is preempted by ERISA and will be dismissed. As this is the only claim against this defendant, the complaint against Adspace will be dismissed.

### 2. **Standard of Review to Be Applied**

The parties agree the Plan gives MetLife discretion to determine eligibility for benefits.[19] Therefore the proper standard of review in this case is arbitrary and capricious. It is also undisputed that because the administrator is both the evaluator and payer of benefits, MetLife is conflicted. Thus, based on Glenn, MetLife's conflict of interest must be weighed as one among a combination of relevant factors in determining whether the administrator's decision was arbitrary and capricious. Glenn, 128 S.Ct. at 2348.

In deciding whether to expand review beyond the administrative record, MetLife's conflict of interest must be considered with other factors weighing in favor of good cause. As discussed above, a flawed decision-making process or procedural problems may support a finding a good cause. The Claim Comments List and e-mails in the administrative record

---

[19] The Plan provides that Evidence of Insurability must be satisfactory to MetLife, and allows MetLife to determine whether an applicant is insurable. This language grants MetLife discretion to determine insurability.

between MetLife employees[20] raise questions about MetLife's basis for denying coverage including the date decedent's SOH was received by MetLife.  Further it is unclear whether SOH approval would have been granted upon receipt of the SOH by MetLife, upon submission of the SOH for medical underwriting, or after underwriting was completed.

A June 19, 2008, e-mail between MetLife employees[21] indicates that Adspace submitted a SOH for $420,000 but that MetLife did not send it to underwriting to review.  A June 20, 2008, entry on the Claim Comments List however indicates that the SOH was not received until almost a month after the decedent died.  A December 6, 2008, entry states that a denial was never completed for the supplemental coverage in excess of the NMI amount. A January 21, 2009, entry indicates that a denial for the additional amount claimed was being mailed because no SOH was received prior to the decedent's death.  The denial letters issued to plaintiffs on January 24, 2009, cite to the lack of medical Evidence of Insurability as the basis for MetLife's denial of the $320,000.

Taking into account MetLife's conflict of interest and the review process engaged in here by MetLife, good cause exists to expand review beyond the administrative record.  As a result the deposition testimony of Adspace's former HR Director Ms. Krasnyansky, the May 7, 2008, letter and enclosures, and other materials received through discovery will be considered in determining whether MetLife's determination was arbitrary and capricious.

---

[20] The e-mails and entries at issue were drafted by Ms. Leverenz, Mr. Gondek, Ms. Espinosa, and Ms. Kloczkowski.

[21] The e-mail was sent by Ms. Leverenz to Mr. Gondek.

### 3.  <u>Reasonableness of MetLife's Decision</u>

Despite several preliminary matters and varied arguments by the parties, the issue is whether MetLife's denial of plaintiffs' claim for $320,000 of benefits in excess of the $100,000 NMI amount was arbitrary and capricious.  If any issues of material fact exist as to whether MetLife's determination was arbitrary and capricious, both motions must be denied.

The decedent requested contributory insurance on April 1, 2008, the very same day he became eligible under the Plan.  Pursuant to the Plan provisions, insurance for which decedent was not required to give Evidence of Insurability was effective April 1, 2008.  The NMI amount of $100,000 did not require Evidence of Insurability and thus that amount was effective April 1, 2008.  It is undisputed that the decedent was actively at work on April 1, 2008, as required by the section titled Eligibility Provisions: Insurance for You.  <u>See</u> MET 0098.

The parties agree the Plan requires Evidence of Insurability for coverage in excess of the NMI amount and that MetLife has discretion to approve or disapprove the Evidence of Insurability.  The Plan provides that upon MetLife's determination that the Evidence of Insurability is satisfactory, the insurance will take effect on the date they state in writing.[22]

Plaintiffs argue that because "Evidence of Insurability" is unclear, decedent's completion of the SOH satisfied the Evidence of Insurability requirement.  Pls.' MOL, at 11, Dkt. No. 23-2.  They allege decedent obtained coverage in the amount of $420,000 upon submission of the enrollment forms and SOH to Adspace.  They contend that MetLife

---

[22] "If You are required to give evidence of Your insurability and We determine that You are insurable, such insurance will take effect on the date We state in Writing, provided You are Actively at Work on that date."  MET 0098.

provided the effective date in writing--April 1, 2008, the date pre-printed throughout the Plan documents, enrollment forms, and indicated in the Certificate of Insurance accompanying the May 7 letter.  Thus, they conclude April 1, 2008, is the effective date for the full $420,000 of coverage and not some later date to be determined by MetLife.

Conversely, MetLife contends that supplemental coverage beyond the NMI amount was contingent upon approval or disapproval by MetLife--approval which could only be contemplated after decedent submitted the SOH and MetLife engaged in underwriting. Therefore defendants claim the $320,000 of supplemental coverage was not yet in effect as of April 1, 2008, and could not be in effect until MetLife processed the SOH and conducted further investigation if they deemed it necessary.  MetLife argues it would be after that process that they would issue in writing, if at all, notice of the effective date for the supplemental coverage.

Although there is merit to both arguments, neither is entirely convincing.  The Plan provides, and the parties agree, coverage in excess of the $100,000 NMI amount requires approval.  The Plan dictates that supplemental coverage will take effect on the date MetLife states in writing.  Based on this, MetLife's contention that coverage in excess of $100,000 was not automatic is a reasonable interpretation and plaintiffs' claim that SOH approval was automatic upon submission of decedent's enrollment forms is unpersuasive.  If, as plaintiffs contend, there was automatic coverage for the full amount of supplemental benefits elected by an applicant, the NMI guaranteed amount would be meaningless because all employees would be automatically provided the full amount of coverage they elect.  MetLife contends that because they did not yet engage in underwriting, they did not approve decedent's

Evidence of Insurability, and thus as of Roger Knopick's death, MetLife had not yet provided an effective date of coverage in writing.

The evidence is to the contrary.  MetLife's May 7, 2008, letter to Adspace's HR Director informed her that the installation of Adspace's new coverage with MetLife was complete.   The Certificate of Insurance, enclosed with the May 7 letter and also dated May 7, 2008, states that the policy will take effect on April 1, 2008.

MetLife contends there are various branches of the Plan but that when discussing the policy, people refer to the Plan as a whole.  Thus, they contend the May 7 letter and accompanying Certificate of Insurance referred to the Plan as a whole and the April 1, 2008, effective date listed in the Certificate applied to the Plan as a whole.  They claim that the Plan provision, stating that MetLife would notify applicants in writing of the effective date for insurance requiring Evidence of Insurability, remained applicable for supplemental coverage in excess of the NMI amount.

Despite this contention, the fact remains that neither the May 7 letter nor the Certificate of Insurance distinguished between types of coverage.  The Certificate provided an effective date of April 1, 2008, for the Plan.  The documents did not specify that supplemental coverage beyond $100,000 was not in effect until a later date provided by MetLife.  The May 7 letter nor Certificate of Insurance informed Adspace that MetLife would subsequently produce an additional writing with an effective date for supplemental coverage in excess of the NMI amount.

Assuming the April 1, 2008, effective date provided in the Certificate of Insurance did not refer to coverage beyond $100,000, pursuant to the Plan provision, applicants were entitled to receive notice in writing from MetLife regarding the effective date of that

supplemental coverage.  The administrative record, nor discovery engaged in by plaintiffs have produced any documents suggesting that MetLife thereafter sent additional notice for individuals in the group who may have applied for supplemental coverage.  Neither have the defendants produced any writings which suggest that after the May 7 letter, any applicants or the employer were notified in writing of the effective date of supplemental coverage.  Additionally, MetLife never came forward with the Certificates of Insurance for individual insured employees as mentioned in the May 7 letter.[23]

While puzzling, it is not necessary to determine whether MetLife commonly neglects to notify applicants in writing of the effective date for supplemental coverage.  In the absence of any additional writings or evidence, we are left with MetLife's May 7, 2008, letter and accompanying Certificate of Insurance.  The letter indicated to Adspace that the "new coverage(s) with us is now complete."  The Certificate of Insurance listed an effective date of April 1, 2008 for the policy.  Neither the letter nor Certificate distinguished between applicants or types of coverage.

It is reasonable to conclude that the May 7 letter and enclosed Certificate of Insurance from Metlife therefore accepted coverage for the class of applicants who applied for life insurance under Adspace's group policy and that the coverage included supplemental coverage having an effective date of April 1, 2008.  The decedent was a part of the class that enrolled for life insurance through Adspace on April 1, 2008.  Neither the letter nor Certificate

---

[23] As previous mentioned, the letter stated: "Additional Certificates for you to distribute to all of your insured employees will be shipped separately within the next few days."

of Insurance exempted the decedent from coverage even though it presumably could have.[24]

Additionally, as required by the Plan, the decedent was actively at work on the Plan's

effective date of April 1, 2008.

The letter and accompanying Certificate must be construed as writings from

MetLife accepting coverage and providing an effective date of April 1, 2008, for the Plan--for

both the NMI amount of $100,000 and the supplemental amount of $320,000.  Therefore, the

decedent's $420,000 of life insurance was in effect on April 1, 2008, one week before he

died on April 8, 2008.

As discussed above, MetLife both evaluates and pays claims under the Plan, thus

a conflict of interest exists.  This factor weighs in favor of finding that MetLife's decision was

an abuse of discretion.  Based on the relevant factors including MetLife's conflict of interest,

the electronic communications between MetLife employees, and most significantly the May 7,

2008, letter and Certificate of Insurance, MetLife's determination to deny $320,000 in

supplemental life insurance benefits was an error of judgment.  The evidence relied upon by

MetLife does not support a finding that the decedent had not yet received SOH approval prior

to his death.  Instead the evidence, namely the May 7 letter and Certificate of Insurance

indicates that MetLife did accept, in writing, coverage for all applicants, including the

decedent, and provided an effective date of April 1, 2008.

Since by its own records decedent's policy was in effect on April 1, 2008, one week

before his death, and because decedent was actively at work on that date, it was arbitrary

and capricious for MetLife to deny decedent's supplemental coverage in the amount of

---

[24] The letter was sent approximately one month after Roger Knopick died and presumably could have excluded him from coverage.

$320,000.  There are no issues of fact which, if true, would prove that MetLife's determination to deny benefits was supported by substantial evidence.  Accordingly, plaintiffs' motion for summary judgment will be granted.

As previously discussed, District Courts are generally required to limit their review to the administrative record.  If that review finds the administrator's decision was arbitrary and capricious, it must remand to the administrator with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or if remand would otherwise be a useless formality.  Miller, 72 F.3d at 1071. Additionally, "remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable."  Zervos, 277 F.3d at 648 (internal quotations and citation omitted).  Here, remand is inappropriate because the record is complete and MetLife's denial of benefits based on that record was unreasonable.  No new evidence would support a conclusion that MetLife's denial of benefits was reasonable and thus remand would be a useless formality.

## IV.  CONCLUSION

Plaintiffs' motion for judgment on the record will be considered as a motion for summary judgment in light of the procedural posture of the case.  Additionally, the Knopicks' breach of contract claim against MetLife will be construed as a cause of action under § 1132(a)(1)(B).

Plaintiffs' only cause of action (negligence) against Adspace is preempted by ERISA because it relates to the Plan.  Therefore, the complaint will be dismissed against Adspace.

Plaintiffs' motion for summary judgment will be granted, and defendants' motion for summary judgment denied, because there are no issues of fact which, if true, would prove that MetLife's determination to deny benefits was supported by substantial evidence. Remand would be a useless formality and thus inappropriate because no new evidence could support a denial of the claim.  Accordingly, MetLife's decision to deny supplemental coverage in the amount of $320,000 and thus deny plaintiffs' claim for $240,000 is reversed.

Therefore, it is

ORDERED that

1.  The First (Breach of Contract) Cause of Action is construed as a claim under 29 U.S.C. § 1132(a)(1)(B);

2.  Plaintiffs' motion for judgment on the record is considered as a motion for summary judgment;

3.  Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART;

4.  The complaint against defendant Adspace Networks, Inc. is DISMISSED;

5.  Plaintiffs' motion for summary judgment is GRANTED;

6.  Metropolitan Life Insurance Company's decision denying supplemental life insurance coverage is reversed; and

7.  Metropolitan Life Insurance Company shall pay benefits in the amount of seventy percent (70%) of $320,000, or alternatively, $224,000 to plaintiffs Dillon A. Knopick and Stefani L. Knopick.

The Clerk of the Court is directed to enter judgment dismissing the complaint against Adspace Networks, Inc., and in favor of the plaintiffs Dillon A. Knopick and Stefani L.

Knopick and against the defendant Metropolitan Life Insurance Company in the sum of $224,000.

IT IS SO ORDERED.

_____
United States District Judge

Dated: October 14, 2010
      Utica, New York.